Case number 14-1036 et al., Center for Biological Diversity et al. Petitioners v. Environmental Protection Agency Ms. Gooding for the petitioners, Mr. Anatoine for the respondent   Ms. Gooding for the petitioner, Okay, so we're required, you know, prior to Steelco, we would have simply decided the merits here and remanded it, but we can't do that anymore. We now have to decide standing. So here we have a case where, you know, we have to decide standing first, but there's no merits, right? Right. There's no merits dispute. It's so strange. Your Honor, I would, on the jurisdictional point, I think it creates a very challenging situation. There's a famous Civil War general who once said in the middle of a battle, this is like living upstairs over a vacant lot, which is what this case is like. It is something like that, Your Honor. There's nothing there other than standing. I've never seen anything like this. Your Honor, I would just note quickly that to make the adequacy of the record the only consideration here without any reference to the process that produced that record means that the parties will have to potentially fight over whether the record is adequate or not before figuring out which court has jurisdiction to hear the claim, and I don't think that's what Congress intended. They said following a public hearing, which indicates that a specific type of agency process was what they had. I understand. I just don't understand. You know, you're worried about this pesticide. Yes. You can get your fastest relief right here, assuming we think you have standing. The only reason you might not is if the district court, if we didn't think you had standing, but the district court did. Now, I don't know whether that's part of your calculation or not, but you can get a lot faster relief here if we think you have standing, then you have to go all the way back to the Because the government has said it's going to raise standing there, right? It has. We feel that we have adequately demonstrated that we have standing for this court and for the district court as well. Thank you.  May it please the court. My name is Travis Anatoin. I'm with the Department of Justice, and I'm representing the Environmental Protection Agency. I'd like to address first the district court's order dismissing the senator's complaint, and then move on. Would you just, am I right about this case, that if we think Petitioner has standing and the EPA, the government, agrees, it's got to go back, right? That's correct, Your Honor. And what's the reason why, given that's the government's position, and I realize you're from the Justice Department, and you don't have to answer this question, obviously you don't know, but if the agency agrees it has to do the endangered species analysis, and you and the petitioner both agree that the registration shouldn't be vacated, just remanded, why doesn't EPA just do it? Why are we spending all our time trying to figure out whether these people have standing? Well, Your Honor, we did have some settlement discussions. They were fruitless. I think it's important to understand that this case comes against a backdrop of now going on a decade's worth of efforts to streamline and synthesize the interaction between FIFRA and the endangered species. Right. I got that. Yeah. So there are... So is your concern, let me just cut to the chase here. Is your concern that the remedy, if there's a remedy here, it will upset the way the agency has prioritized its efforts to comply with the statute? In other words, as I understand it from your brief, the agency has decided to do the most risky pesticides first, right? And it thinks this pesticide is less risky, right? That's correct. So is the agency's concern that if plaintiffs, if the petitioners win, it will force the agency to move quicker on a less risky pesticide than on the more risky ones? That's part... Is that what's going on here? That's part of the concern, Your Honor. Is there another part? Yes. I think the other part is that the agencies are still working on creating a framework for this type of consultation. For many years, the EPA was under a good faith belief that the ESA Section 7 requirements did not apply up front at the national level, and it was only since around the time of Washington Toxics that the agency learned that, in fact, it was required to consult. At that point, there were over 1,100 active ingredients that required consultation, dating back decades. And these consultations are huge nationwide undertakings. They go not just to the particular species at issue, which may number in the thousands. They go to agricultural use and climate, geography. It requires a wealth of modeling and cooperation between not just the three agencies, but all the affected parties, all the stakeholders. So part of it is, Your Honor, this worry about line cutting, but part of it is, in some sense, the mechanisms simply aren't there yet to effectuate the type of consultation that EPA and the services, the expert services, would like. Okay. Your Honor, I do want to just briefly touch on the two jurisdictional issues addressed by the district court, then move on to standing. With respect to the public hearing question, Your Honor, as you noted... Well, you agree the case should be here, right? Yes, we do, Your Honor. I just wanted to emphasize, with respect to the public hearing, the process that occurred here. EPA did undertake two rounds of notice and comment. It took dozens of comments, responded to those comments in detail, including comments from petitioners, and compiled a 100,000-page record, which is more than enough to evaluate the legal issues before the court today. Secondly, going back to at least city of Rochester rebond, what this court has held with respect to bifurcated review statutes like FFRA, is that where Congress determines that review of particular agency actions should be in the Court of Appeals, that necessarily ousts competing grants of jurisdiction to the district courts in independent statutes. And that's exactly how FFRA operates vis-a-vis the ESA. And indeed, if one looks at the plaintiff's complaint and petitioner's petition, it's very clear that their challenges bound up with the ESA are inextricable from their challenge to a pesticide registration order. If there's no further questions on the district court's order of dismissal, I would like to discuss standing. The court should dismiss the senator's petition for want of standing because petitioners have not demonstrated an actual and imminent injury as required by Article III, but only an abstract, conjectural injury. And in particular, I want to stress that this court has been very exacting and careful in its declarations, where, as here, petitioners premise their theory of injury not only on the actions of third parties not before the court, in this case, the end users of signed familial coal, but also an additional set of third parties, the regulated parties, the interveners. So there's a fairly long causal chain from the onset. And in this case, petitioners haven't met their burden for at least three reasons. Let me ask you about your first point, that petitioners haven't shown that farmers will use it. EPA itself says that this is the most effective pesticide. It says, quote, it's an essential tool to citrus growers and blueberry farmers, which are under serious threat. And it says this pesticide is the most effective alternatives for combating these evasive insect. So I mean, why isn't that enough? The producers of this have spent a huge amount of money getting this pesticide registered. EPA says it's the most effective. Isn't it fairly obvious that the farmers will use it? Yes, Your Honor. We don't contest as a general principle that users, end users of signed familial coal will use signed familial coal. What we're contesting is the showing by petitioners that users near the declarants and near the declarants profess species of interest will use signed familial coal. And in cases where this court has. Well, the record shows this overlap between where these two insects are and where blueberry and citrus farms are. Now, you disagree about the extent of the overlap, but the evidence shows there's an overlap. So what else do they need to show? We think they need to show at least two more pieces of evidence. The first thing they need to show is that signed familial coal will actually adversely affect these particular species. What the risk assessment prepared by EPA shows is that based on representative samples, the pesticide is harmful at most at the level of taxa. Yeah, but that's that's two things like birds and mammals. Not didn't the risk assessment say it was risky to insects at the level of taxa? Yeah, it is. Generally speaking. Well, so they have a study that says the old study says it's it's risky to insects. These are this beetle and this butterfly are insects. What what more do they need? I mean, you could come forward with evidence that it's not it's not toxic to these two insects. But that's the only question before us. And I don't see that evidence. Well, your honor, to to clarify what the risk assessment does not say is that scientific rule is harmful to all insects. It just is predictive in general, saying that there may be some concern to insects with the risk assessment. But there's also the question of what if if the citrus farms and the blueberry growers are having problems now without this pesticide, it doesn't mean they're not using any pesticide. They're using some sort of pesticide that is not as effective. And so there's there's room in there, it seems to me, for a comparative analysis. If the pesticides are using now are killing more insects that are not threatening the farms and this pesticide would not, then that is a net gain, not a net loss. Yes, your honor. I think that that is certainly a possible scenario. Candidly, the EPA and petitioners, according to their brief, don't know how these pesticides affect a particular species because the framework for consultation isn't there. It is plausible that certain species are better off in this case. I think the point is that the record say that this pesticide is more effective and less effective. I think the DuPont study said suggests that farmers will use this. This is this is more effective. This this will be this will be used in addition to the existing pesticides. Right. It could, in theory, part of the problem with the the declarancy is that there's just no information as to what's happening on the ground in these particular locations that the particular overlaps, which have been the basis for the court's jurisdiction in cases like the Sierra Club cases from 2014, when petitioners haven't been able to show that nexus as in Florida Audubon, as in the Sierra Club case from 2002. Is there anything in the record indicating that whatever pesticide is being used now is less expensive than this particular product would be? Yeah, I'm not aware of that. The reason a farmer wouldn't use it, even though it's more effective, is because it's much more expensive. I'm thinking of personal experiences of new pesticide out called Tenacity that kills nimble will, which I unfortunately have in my lawn. So I thought, oh, this is great. It's the only selective one. And so I got on the Internet and it was nine hundred and ninety dollars a gallon. So I decided to pass. I'm not aware of anything in the record that that breaks down the pesticides by cost. But I will say that there are additional reasons to use varying pesticides, including human health. And what's what the record does establish is that for farm workers, especially Scientunilla Pro will be less toxic than its counterparts. What is the term EPA uses for saying that the pesticide is less dangerous to humans? There's a particular term. In the risk assessment, it's generally labeled as as less toxic. The specific measurements deal are labeled as risk quotients, which is essentially exposure over the denominator, which is levels of the pesticide, which are harmful under certain measurements to each individual species. But generally, it's just really referred to as toxicity. Let me make sure. So we understand from the risk assessment that it is toxic to insects generally, correct? That's correct. So is there anything in the record that says it's not toxic? Well, let me ask you, is there anything in the record that says it's less toxic than other insecticides? Absolutely. Your Honor, the insects to insects. Yes, I think the most concrete example I can give you on that point is vis-a-vis honeybees. So OK, but that's we're not talking about honeybees here. These people are watching beetles and and and butterflies, but they're not worried about bumblebees, honeybees. But what about these two insects? There is nothing in the record that demonstrates conclusively that that this pesticide is better. So the burden is on the petitioner and they've cited EPA study, which says it's toxic to insects. And the only insect that I know of, as you just pointed out, that it isn't toxic to in the record is the honeybee. So isn't it EPA's burden to come forward with evidence that, well, yes, it's toxic generally to insects, but it's either not toxic to these two bugs or it's less toxic than other insecticides. Those two things I don't see in the record. But it would be our burden, respectfully, Your Honor, we disagree that that petitioners have made that the prima facie is showing that, in fact, scientific liberal is harmful to these particular insects. The National Academy report spells this out very clearly that it's impossible to draw conclusions regarding the effects to particular species from documents like the risk assessment. That's the whole point of further consultation. And beyond that, the only other point I'd make, with respect to standing, is that the scientific liberal use. One of the tightest overlaps we could find alleged in petitioner's declarations was in that of Martha Crouch. She alleges that she's concerned about sandhill cranes in Jasper County, which is around 560 square miles because there are allegedly 100 acres of blueberry farms in Jasper County. Now, even assuming that scientific liberal is harmful to cranes and that all 100 acres use scientific liberal, that overlap turns out to be only three thousandths of one percent of Jasper County. And we think under Summers, which held at an 800 square mile nexus, was insufficient to show standing under the circuit's cases like Sierra Club in Florida Audubon, like I've mentioned. That's far too thin a read to premise an injury in fact on. And as I've said, that's one of the tightest overlaps. This particular pesticide does not accumulate in the soil. What is it, dissipate into the atmosphere? Well, it's less likely to bioaccumulate than its counterparts. It does degrade into multiple components. And those are assumed to have the same toxicity as scientific liberal itself. And it's less harmful to honeybees, which is a big deal because without honeybees, you don't get fruit and you don't get blueberries. That's correct. The appendix at 442 and 500 spells out how, especially compared to organophosphates and other pesticides, scientific liberal, from what we know, is generally less toxic to honeybees. The toxicity studies, are they species specific or general? I can try to answer your question by spelling out the consultation process in a bit more detail. There's three levels. The first is a screening level assessment where what the EPA does is it tries to rule out no effect determinations for an entire taxa. And for the, at this level, which is what the court has in front of it, it uses representative species. Well, you haven't done, the EPA hasn't done that in this case, right? It has done that, Your Honor. It has or hasn't? It has. That's the risk assessment that's in the appendix. Well, what does this sentence mean in your, you say, should the court read some merits to this claim, EPA does not contest that it has not made an effects determination. By the way, that's a good reason why you shouldn't use a lot of nots in a sentence. Noted, Your Honor. Excuse me, but doesn't that mean EPA has not made the effects determination? Well, so following the National Academy report in 2013, EPA huddled with the Fish and Wildlife Service and the National Marine Fishery Service. And what came out of that process and what came out of the National Academy report was following the screening level assessment, which is what we have now. So EPA looks at onions or rainbow trout. It then goes back and it really refines the models and it takes a hard look at a species life cycle, the geography, where the species lives. It looks at the agricultural patterns, the climate, and it tries to much more thoroughly document how the species could be affected. And the EPA has done this for three trial pesticides. It's just finished that in December. And it's only at that stage that it makes the may affect determination. I see. So that hasn't happened in this case. That has not happened. I get you. Okay. That's now I understand. Okay. I see I'm well past my time. So if it goes back, if it is remanded, the EPA will have to do that first, right? Yes, Your Honor. And it could conclude based on that that it then doesn't need to consult with the endangered species people, correct? At that stage, it would render a not likely to adversely affect determination. If the expert agencies concur, there's no further consultation. Gotcha. Okay. That was helpful. Thank you. Thank you, Your Honor. Thank you. Why don't you take two minutes? Thank you, Your Honor. A few points on standing to start. The action we have here before us is EPA's decision to authorize this pesticide. There are certainly other threats to these species, but EPA, nothing in EPA's decision here requires that any other pesticide be used less as a condition of this pesticide's use. If EPA had actually said in its decision, this pesticide can only be used where these other more toxic pesticides aren't used, would have a very, very different fact pattern. That's not what we have. And we have EPA and the registrant saying we expect it will be used in addition to other pesticides. I agree, Judge Tatel, that the general statements in the risk assessment that it is toxic to this taxa do meet our prima facie showing that there is likely harm to these specific species within that taxa, and we have nothing that would indicate to the contrary. I also want to turn that quickly to kind of what this case is about. Could you say a little more about standing? Yes. I understand your point about how it's you think you've met your burden that it's likely to be used. But what about the overlap problem? Your Honor, could you say something about that? Yes, we've identified species, for example, the Mitchell's satyr butterfly, which exists only in the largest blueberry growing county in Michigan, which is the largest blueberry growing state in the country. And we've shown that this butterfly's habitat is in and around these blueberry fields. This is one of the crops that EPA has said it is desperately needed, San Genile pole, to combat these crops. And so we think it is the largest blueberry producer, I thought it was New Jersey. Michigan is by acreage. I think New Jersey might be by volume. And is this in your reply brief the response to the DuPont analysis? Is that where that is? Yes. We have an additional declaration that is attached to our reply. That's Mr. Bradley. Yeah. And so tell me what that you think that shows. We think it's a substantial overlap between agricultural uses and this butterfly. And we've also shown that the. Is that the 93 percent? Is that that number? Let's see. There are a few. I would have to pull the. What is the number that I should be looking at here? So for. It's not. There are a few different analyses in that. So it looks at the what's called an elemental occurrence, which is a specific time the butterfly was sighted. That overlap for the butterfly was ninety two point four percent. And that's overlap where there are blueberry fields, correct? Yes, your honor. Where there are excuse me, where there are. So the agricultural areas don't distinguish by crop. It's where there are agricultural areas. So we can't tell whether those are blueberry fields or not. But we do know that it is the biggest by acre blueberry producing county. I see. OK. And. OK, thanks. What were you going to say about. Did you have something else to say about the standing? Is there anything else you want to say about standing? I'm just that your honor, this case does not present the kind of chain of attenuation that this court has found unacceptable. In other cases, we're simply saying that it is likely that this pesticide will be used in exactly the ways that EPA is saying that it is likely that it will be used. I see that out of time, so we would ask this court to reverse the district court and remand.
judges: Henderson, Tatel, Randolph